FILED
2011 Jan-19  AM 09:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATED DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| O'NEAL STEEL, INC. and LEECO STEEL, LLC, | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| vs. | ) ) | **CIVIL ACTION NO.:** |
| WORLDWIDE STEEL UNLIMITED, INC.; GENERAL PURPOSE STEEL, INC.; LANCE CHATKIN; and BRUCE ADELSTEIN, | ) ) ) ) ) ) | **CV _____** |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiffs O'Neal Steel, Inc. and Leeco Steel, LLC, for their Complaint against Defendants Worldwide Steel Unlimited, Inc., General Purpose Steel, Inc., Lance Chatkin, and Bruce Adelstein, state as follows:

## NATURE OF THE CASE

1.     This is an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") brought by Plaintiff O'Neal Steel, Inc., and Plaintiff Leeco Steel, LLC, for violations of 18 U.S.C. §§ 1962(c) and (d), as well as for fraud, misrepresentation, negligence and wantonness, civil conspiracy, and breach of contract and warranty.  It targets a criminal enterprise, as defined by RICO, controlled by two persons who, through two corporations and various employees,

fraudulently represented the quality of goods sold to enrich themselves and the companies they controlled through unlawful means, including mail and wire fraud, in disregard of possible personal injury, death, property damage or cost and expense.

2.      By virtue of this criminal enterprise, Defendants passed off inferior, untested steel as steel meeting certain industry specifications and thereby induced Plaintiffs to unknowingly buy the inferior, untested steel at inflated prices. Plaintiffs, relying on Defendants' representations and certifications that the steel was tested and met the specifications in Plaintiffs' purchase orders, then unknowingly sold this inferior, untested steel to Plaintiffs' customers as steel meeting the customers' specifications for applications for which it was potentially dangerously unsuited.  In fact, none of the steel sold by Defendants to Plaintiffs had been tested either by the manufacturer or independent laboratories as represented and certified by Defendants, and much of the steel did not in fact meet the specifications in Plaintiffs' purchase orders as represented and warranted by Defendants.  If the steel did meet the specifications, it was completely fortuitous and not by virtue of test results as represented by Defendants.

3.      Plaintiffs' customers included the United States Military, manufacturers of railroad freight cars, manufacturers of bucket trucks used for

repairing power lines and other items many feet high above ground, and manufacturers of ladder trucks used in firefighting. Much of the steel ordered by Plaintiffs was intended to be High Strength Low Alloy ("HSLA") steel which is stronger and tougher than carbon steel, and is durable, highly formable and weldable. HSLA steel is intended primarily for use in structural applications where strength, as well as savings in weight and added durability, is critical. Furthermore, much of the steel ordered by Plaintiffs was intended to be steel with a very high yield strength, or steel where strength is critical. Defendants knew or must have known that the inferior, untested steel sold by them to Plaintiffs would ultimately be used in applications where it was essential for safety that the steel meet certain critical physical and chemical standards. Nevertheless, and knowingly or recklessly disregarding the danger posed by their sale of inferior, untested steel, Defendants persisted in pursuing their illegal enterprise, resulting in heavy equipment across the country and abroad containing safety-critical components made of inferior, untested steel.

## JURISDICTION AND VENUE

4.     Plaintiff O'Neal Steel, Inc. ("O'Neal") is an Alabama corporation having its principal place of business located at 744 41st Street North, Birmingham, Alabama, in Jefferson County, Alabama. O'Neal is a full-line metals

service center which, among other things, locates and provides to its customers requested standards and grades of steel.

5.      Plaintiff Leeco Steel, LLC ("Leeco") is an Alabama limited liability company having a place of business located at 744 41st Street North, Birmingham, Alabama, in Jefferson County, Alabama.  Leeco is a subsidiary of O'Neal and is a supplier of various types of steel, including carbon steel, HSLA structural steel plate and alloy steel plate.

6.      Defendant Worldwide Steel Unlimited, Inc. ("Worldwide") is a steel distribution and brokerage company.  Worldwide is, on information and belief, a Pennsylvania corporation with its principal place of business located at 1001 East Entry Drive, Suite 200, Pittsburgh, Pennsylvania 15216, and a place of business at 4423 Renaissance Parkway, Cleveland, Ohio 44128.  Worldwide does business in Alabama and specifically in Jefferson County, Alabama.

7.      Defendant General Purpose Steel, Inc. ("General Purpose") is a steel distribution and brokerage company.  General Purpose is, on information and belief, a Pennsylvania corporation with its principal place of business located at 505 Braddock Avenue, Turtle Creek, Pennsylvania 15145-2066, and a place of business located in Decatur, Alabama.  General Purpose does business in Alabama.

4

8.     Upon information and belief, Defendant Lance Chatkin resides at 300 Meadow Court, Monroeville, Pennsylvania 15146 and is a citizen of the Commonwealth of Pennsylvania.

9.     Upon information and belief, Defendant Bruce Adelstein resides at 18 Laurel Hill Lane, Pepper Pike, Ohio 44124 and is a citizen of the state of Ohio.

10.    This Court has original jurisdiction over the civil RICO claim stated herein pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a).  This Court also has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum of $75,000.00 and the parties are citizens of different states.  The Court may exercise supplemental jurisdiction over the state law claims stated herein pursuant to 28 U.S.C. § 1367, as all of the claims are inextricably intertwined.

11.    Venue is proper in the Northern District of Alabama pursuant to 18 U.S.C. §§ 1965(a) and (b) because Defendant Worldwide transacts its affairs in this judicial district, and because the ends of justice require that other parties residing in other judicial districts be brought before this Court.  Venue is also proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

12.     This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965(d).  Defendant General Purpose has a place of business in this judicial district.  Defendant Worldwide, at a minimum, transacted business in this judicial district and one or more Defendants may be found to have an agent in or to transact its affairs in this judicial district.

## FACTS

### Overview and Parties

13.     For a number of years, O'Neal and Leeco purchased steel from Worldwide or its predecessors.  According to information available from the Pennsylvania Department of State, an entity named Worldwide Steel Unlimited, Inc. was created on April 23, 2009, in the Commonwealth of Pennsylvania.

14.     Prior to April 23, 2009, Worldwide and/or Bruce Adelstein and others were doing business using various iterations of the name "Worldwide," including Worldwide Steel, LLC and Advance/Worldwide Steel.  O'Neal's contact person and sales representative at Worldwide, Tom Macino, was always the same, regardless of which name Adelstein and company were operating under at the time. Leeco's contact person and sales representative at Worldwide was Bob Wood, and similarly, was always the same regardless of which name Adelstein and company were operating under at the time.

15.    Upon information and belief, since April 2009, Worldwide has been majority owned and/or controlled by Lance Chatkin.  The remainder of Worldwide is owned by Christina Nielsen.

16.    Lance Chatkin is President of both General Purpose and Worldwide according to the Pennsylvania Department of State's database.

17.    Upon information and belief, General Purpose was and is owned by Lance Chatkin and/or his father, David Chatkin.

18.    Upon information and belief, General Purpose provides, and has provided since April 2009, operational support, including accounting, invoicing, and collection services, for Worldwide, though, upon information and belief, it does not own Worldwide.

19.    Currently, the Registered Office Address for Worldwide, listed with the Pennsylvania Department of State, is 1001 East Entry Drive, Suite 200, Pittsburgh, Pennsylvania 15216.

20.    Currently, the Registered Office Address for General Purpose, listed with the Pennsylvania Department of State, is 505 Braddock Avenue, Turtle Creek, Pennsylvania  15145.

7

21.     Worldwide and General Purpose share some of the same officers, including Lance Chatkin, who is President of both entities, and Von Argyle, who has represented himself as CFO for both entities.

22.     Prior to the formation of Worldwide, Bruce Adelstein, Christina Nielsen and Tom Macino worked for Advance Steel Company as part of Advance/Worldwide.  In 2009 they left Advance/Worldwide to join Lance Chatkin in the formation of Worldwide.  The actions by Adelstein, Nielsen and Macino resulted in a lawsuit by Advance Steel Company against them.  *See Advance Steel Co. v. Nielsen*, No. 2:09-cv-13724 (E.D. Mich. Oct. 19, 2009).

## General Business Operations

23.     O'Neal is a full-line metals service center.  A metal service center serves as an intermediary between metal producers and the end users of metal products.  O'Neal inventories and provides a wide variety of standards and grades and types of metal products primarily to original equipment manufacturers as well as a variety of end users across a diverse customer base.  Many of these original equipment manufacturers and other end users are in the aerospace, agriculture, appliance, construction, defense, distribution, fabrication, machinery, medical, metal finishing, transportation and wind energy industries.

24.    Leeco is a specialty steel service center that inventories and supplies steel plate product to the energy, heavy construction and general plate industries and to fabricators, manufacturers and service centers.  Leeco also supplies leveled and flattened steel, cut from steel coil, to existing customers who need such steel.

25.    Leeco and O'Neal maintain an inventory of steel from which they supply some of their customers' needs.  When a customer requests a standard and grade of steel that O'Neal and Leeco do not have in stock, they send out requests for bids to several vendors believed to carry that type of steel, such as Worldwide, to see who has the steel specified by the customer, the delivery time, and price.  When a bid is accepted, O'Neal or Leeco then send a purchase order to the vendor confirming the specifications for the steel it is ordering.  O'Neal's and Leeco's purchase orders specify the standard and grade of steel being ordered.

26.    In the steel industry, steel is bought and sold based upon the ASTM standards and grades of steel.  Throughout the industry, these standards and grades are established by ASTM International (ASTM), which was originally known as the American Society for Testing and Materials.  ASTM International is an international standards organization that develops and publishes technical standards for a wide range of products and materials, including steel.  ASTM steel

standards are grouped by the end-use or type of steel, and within each classification there are certain steel types and strength grades.

27.   For example, Leeco bought steel plate from Worldwide that was purported to be certified to ASTM standard A656.  The synopsis for ASTM's A656 standard describes the scope of the steel covered by the standard as follows:

> This specification covers three types and four strength grades of high-strength low-alloy, hot rolled structural steel plate for use in truck frames, brackets, crane booms, rail cars, and similar applications.  Steels that conform to this specification offer improved formability.  These steels are normally furnished in the as-rolled condition.  The type and strength grade furnished is as agreed upon between the manufacturer and the purchaser. The types and strength grades are shown in the tables.

The standard identifies with great particularity the critical, structural end-use of the steel – for "truck frames, brackets, crane booms, rail cars, and similar applications."  The standard goes on to specify the chemical compositions required for the various types of steel covered by the standard; the physical or mechanical properties that the finished steel must have, measured in terms of yield strength, tensile strength and elongation in order to meet the requirements for a particular standard and grade; and the testing required to determine compliance with the standard.  For example, ASTM A656-80 steel, which generates a yield strength of

10

not less than[1] 80,000 psi[2], is of higher strength and durability than A656-50 steel, which generates a yield strength of not less than 50,000 psi. Without the physical testing required by ASTM, the steel does not meet any standard and grade and the steel cannot be certified as meeting a standard and grade.

28.     O'Neal and Leeco nominally purchased steel from Worldwide represented and certified to be structural grade steel, such as that meeting the above-described ASTM A656 standard, to be used in high-stress applications critical for safety. O'Neal and Leeco paid a premium for what they thought was high-end steel meeting these standards. O'Neal and Leeco purchased this steel from Worldwide because Worldwide represented that it had the specified standards and grades of steel available, not because the steel was discounted or in any other way sold at a below-market price.

29.     Without certification that steel meets a certain ASTM standard and grade, and the testing to support that certification, the steel is used only for non-structural applications, such as for counterweights. This steel is commonly called "sink in water" or "33 max"[3] steel in the industry. If steel is sold as sink in water

---

[1] Under ASTM standards, the specified grade gives the minimum yield requirement that the steel must meet.

[2] "Psi" refers to pounds per square inch. A similar term, "kpsi," which refers to 1,000 psi, is also often used in the industry. Kpsi is often abbreviated as "psi." The ASTM standards refer to "80 psi," which is equal to 80,000 psi. For convenience, the abbreviation "psi," together with the full numeric value, will be used throughout.

[3] "33 max" means that the steel contains a maximum of 33% carbon.

or 33 max steel, the producing mill will specify only that the steel is 33 max or not graded; there is no ambiguity as to whether steel falls into this category.  Sink in water steel is cheap when compared to steel that is certified as meeting ASTM standards.  A broker selling sink in water steel at prices generally paid for steel that is certified to comply with ASTM standards will make a substantial, albeit fraudulent, profit.

30.    The ASTM standards and grades are well known to manufacturers, brokers, suppliers and consumers of steel.   Certification that steel meets a particular ASTM standard, and a particular grade within that standard, is essential for the operation of the steel industry, and is the foundation upon which every transaction rests.   ASTM standards determine how a mill produces the steel. Certification that the steel meets ASTM standards and grades is how the end-user, or customer fabricating the steel, knows that it is getting steel that is appropriate for its intended purpose, and it is how a steel service center, such as O'Neal or Leeco, knows that it is supplying its customer with the steel the customer orders.

31.    In addition to the standard and  grade, the purchase orders specify the thickness, width and length of the product.  Steel might be produced by a mill in large plates of various sizes or in rolled coils of steel of varying thicknesses and

widths, from which a buyer such as O'Neal or Leeco might cut and level portions to specified lengths and widths.

32.    Upon receipt of the purchase order, the vendor will generally ship the steel to O'Neal or Leeco.  These shipments may come from a variety of locations across the country, as the steel is not always located at a facility owned or operated by the vendor, but may be stored at the facility of a third party.  Accompanying the shipment, either physically or transmitted directly to O'Neal or Leeco by the vendor at the time of the shipment, is a certification that the steel meets the specified ASTM standard and grade and that it has specific chemical and physical properties.

33.    The certification received by O'Neal and Leeco at the time the steel is shipped may take one of two forms: that of a "mill test report" or that of a "certificate of conformance."

34.    In the steel industry, when a mill sells steel of a particular specification it will provide a mill test report to its customer showing the ASTM standards and grades, the chemical analysis of the steel, and the results of testing of the steel's physical properties, that is, the yield strength, tensile strength, and elongation properties of the steel.  The chemical analysis will be the same for each product from a particular "heat," or batch of molten steel, but depending on how it

is further processed, products from a given heat can have different yield strength, tensile strength and elongation properties (collectively, "physical properties").

35.    Sometimes a mill will have a heat of steel or a portion of a heat of steel that does not meet the desired specifications or for some other reason is deemed to be surplus.  In that case, the mill will not test the steel to determine its physical properties, but will sell the steel without being tested, and will not certify the steel as meeting a particular grade.  If this is the case, the mill will not provide a mill test report, although the mill may provide a chemical analysis of the steel. This steel may be purchased by buyers who then have its physical and chemical properties tested by an independent lab.  If the test results meet the criteria of a particular ASTM standard and grade, the steel can be sold as meeting the specifications of that standard and grade accompanied by a "certificate of conformance" that the steel conforms to the required specifications and reflecting the chemical and physical properties of the steel.

36.    For plate or sheet steel that is cut from coil, a certificate of conformance is required because coils are rolled by the mill to an ASTM coil specification and the resulting coil steel cannot be certified to an ASTM plate or sheet specification at the mill.  This must be done after the coil steel has been cut and leveled and test pieces, or "coupons," have been cut and tested according to

14

ASTM specifications.  A certificate of conformance is then used to compile all of the available information necessary to demonstrate compliance with ASTM specifications, including the chemical analysis from the mill along with the physical test data performed by the processor or an independent testing laboratory. A mill test report alone would not contain adequate data to certify compliance with ASTM specifications. [4]

37.     A certificate of conformance, which is prepared by the vendor or processor rather than by the mill or a testing lab, certifies to the purchaser that the steel is as represented and that the vendor is in possession of either a mill test report or independent testing data to support the vendor's representations as to the standard, grade and chemical and physical properties of the steel.

38.     Certificates of conformance that accurately transcribe test data are a common and accepted industry practice, and the steel industry generally operates smoothly in reliance upon the truth of these documents.

39.     When O'Neal and Leeco buy steel, they require that the vendor produce either a mill test report or a certificate of conformance certifying the specified standard, grade and chemical and physical properties of the steel being

---

[4]  There are other reasons that a vendor of steel would provide a certificate of conformance rather than a copy of the actual mill test report or independent lab report.  For instance, a vendor may not want its customer to know from whom it purchased the steel, which may in some cases be a competitor service center or broker.  This information is usually shown on the mill test report and independent lab report.

purchased.  O'Neal and Leeco require that both the chemical analysis and the physical test results of the steel be reflected on either the mill test report or the certificate of conformance; a chemical analysis alone is not sufficient to establish that the steel meets a certain standard and grade.  If the steel is delivered with the required documentation and accepted by the purchaser – here, for example, O'Neal or Leeco – then the vendor will issue an invoice and the transaction will be finalized.

40.     Since Bruce Adelstein and company joined with Lance Chaktin and General Purpose in May 2009 and began operating as Worldwide, O'Neal has placed more than 136 orders with Worldwide and purchased more than 2520 tons of what it believed to be certain standards and grades of steel from Worldwide. Worldwide delivered at least 287 tons of steel to O'Neal at its principal place of business in Jefferson County, Alabama, or delivered directly to O'Neal customers in Alabama.  The steel purchased by O'Neal from Worldwide was in the form of leveled plates cut from rolled coils of steel.

41.     Since May 2009, Leeco has placed more than 43 orders with Worldwide and purchased more than 1361 tons of what it believed to be certain standards and grades of steel from Worldwide.  The steel purchased by Leeco from Worldwide was in the form of leveled plates cut from rolled coils of steel and also

16

in the form of "discrete plate," or large, thicker plates of steel formed at a mill rather than cut and leveled from a rolled coil of steel.

42.    For each purchase of steel, at or around the time of shipment, Worldwide provided O'Neal and Leeco with mill test reports or certificates of conformance certifying that the steel being purchased by O'Neal and Leeco met the particular ASTM standard and grade, such as ASTM A656-80, ordered by O'Neal/Leeco or their customer.    The certificates of conformance included chemical and physical test results and certified that the chemical and physical properties shown "are transcribed from information provided by the Owner and the Owner's suppliers, including mills, recognized testing laboratories, etc."    The invoices sent by Worldwide to O'Neal and Leeco also represented the supposed standards and grades of the steel sold.    In fact, however, no mill test reports or independent lab test reports establishing the physical properties, standards and grades existed for the steel sold by General Purpose to Worldwide and then by Worldwide to O'Neal and Leeco.

43.    On information and belief, Worldwide purchased all the steel it sold to O'Neal and Leeco from General Purpose.    General Purpose purchased the steel it sold to Worldwide from mills, including ArcelorMittal, as surplus, "as is," or 33-max steel for which no mill test reports were provided by the mills.    Nor were any

independent laboratory analyses performed by General Purpose or Worldwide to establish the chemical or physical properties of the steel and that the steel met the specifications that were being certified in the certificates of conformance and represented to O'Neal and Leeco.

44.    The only information provided by the mills to General Purpose was a chemical analysis of the steel purchased.  However, the chemical properties on the certificates of conformance provided by Worldwide to O'Neal and Leeco often differed, sometimes substantially, from the chemical properties that the mills had provided to General Purpose or from the actual chemical properties as established by subsequent independent testing ordered by O'Neal and Leeco after their initial discovery of non-conformance.

45.    Upon information and belief, prior to April 2009, the operations of Worldwide's predecessor were not intertwined with General Purpose.  Instead, Worldwide's predecessor bought steel coils, tested them and entered the test results in its own inventory system, and sold the cut and leveled steel from the coils to customers such as O'Neal and Leeco based on mill test reports provided by the mills or on the results of the tests that Worldwide's predecessor had performed by independent testing laboratories.

46.     Upon information and belief, after Bruce Adelstein and company joined with Lance Chatkin and General Purpose and began operations as Worldwide in May 2009, Worldwide purchased all or substantially all of the steel it sold from General Purpose.  When Worldwide received a purchase order from a customer such as O'Neal or Leeco, Adelstein of Worldwide accessed General Purpose's inventory and determined which steel to include in fulfillment of that order.  After the steel was chosen by Adelstein, he instructed Rich Kuny to prepare a certificate of conformance certifying that the steel met O'Neal's or Leeco's specifications.[5]  Mr. Kuny then accessed a database kept by General Purpose or asked employees of General Purpose, including Dick Diamondstone, for the chemical and physical properties of the steel.  If General Purpose, through its database or employees, provided chemical and physical properties for the steel that had been chosen by Adelstein, and if those properties were consistent with O'Neal's or Leeco's specifications, Mr. Kuny would use the chemical and physical properties provided by General Purpose.  If, as often happened, there was no information available on the chosen steel, or if the information conflicted with O'Neal's or Leeco's specifications, Mr. Kuny was instructed by Adelstein to

---

[5] Upon information and belief, Dick Diamondstone at General Purpose prepared certificates of conformance for Worldwide to provide to O'Neal and Leeco from the start of Worldwide's operations in May 2009, until Rich Kuny arrived at Worldwide in September 2009.

prepare a certificate of conformance containing information that met O'Neal's or Leeco's specifications. Worldwide then transmitted the certificates of conformance to O'Neal or Leeco directly, largely via email, and to locations across the country for delivery with the steel sold to O'Neal or Leeco.

47. The Worldwide salesman that called on O'Neal, Tom Macino, claimed that he received all information regarding the steel purportedly available to meet O'Neal's requests for bids, including the purported ASTM standards and grades, directly from Bruce Adelstein.

48. The Worldwide salesman that called on Leeco, Bob Wood, received at least some information regarding the steel available to meet Leeco's requests for bids, including the purported ASTM standards and grades, from Lance Chatkin at General Purpose. For example, in January 2010 Chatkin provided the information below to Christina ("Tina") Nielsen at Worldwide, specifying the ASTM standards and grades, and other physical properties, for certain steel available for purchase from General Purpose. This information then was transmitted by Ms. Nielsen to Bob Wood, and then by him to Leeco:

**From:** LANCE CHATKIN [mailto:lance@gpsi4steel.ccsend.com] **On Behalf Of** LANCE CHATKIN
**Sent:** Friday, January 08, 2010 7:16 AM
**To:** Tina Nielsen
**Subject:** Offerings from GENERAL PURPOSE STEEL

You're receiving this email because of your relationship with GENERAL PURPOSE STEEL. Please confirm your continued interest in receiving email from us.
You may unsubscribe if you no longer wish to receive our emails.

# GPSI

## GENERAL PURPOSE STEEL INC

### Your #1 Flat Rolled Supplier

### Has now become

# Your #1 Plate Supplier

YOU WILL NEVER GET LOST WITH US

| 3/16 | 96x240 | A36 | 94,116 | Memphis |
|------|--------|-----|--------|---------|
|      | 96x240 | A572-50 | 116,827 | Memphis |
|      | 96x288 | A572-50 | 69,160 | Memphis |
| 1/4  | 96x240 | A36 | 137,362 | Cleveland |
|      | 96x240 | A572-50 | 148,606 | Cleveland |
|      | 96x288 | A572-50 | 82,195 | Cleveland |
|      | 96x378 | A572-50 | 99,790 | Cleveland |
| 5/16 | 96x240 | A36 | 88,342 | Memphis |
|      | 96x378 | A572-50 | 99,656 | Cleveland |
| 3/8  | 96x240 | A36 | 126,235 | Cleveland |

| | | | | |
|---|---|---|---|---|
| 1/2 | 72x120 | A36 | 81,160 | Cleveland |
| | 72x240 | A572-50 | 126,406 | Cleveland |
| 5/8 | 72x240 | A572-50 | 96,160 | Cleveland |
| | 72x494 | A572-50 | 49,632 | Cleveland |
| | 96x240 | A572-50 | 88,216 | Cleveland |
| 3/4 | 96x240 | A36 | 121,960 | Cleveland |
| | 96x288 | A36 | 57,400 | Memphis |
| | 96x240 | A572-50 | 160,616 | Cleveland |
| 1" | 96x240 | A36 | 146,028 | Cleveland |
| | 96x240 | A572-50 | 179,860 | Cleveland |
| 1 1/4 | 96x240 | A572-50 | 40,840 | Cleveland |
| | 96x240 | A588 | 42,640 | Cleveland |
| 1 1/2 | 96x240 | A572-50 | 49,800 | Cleveland |
| | 96x240 | A588 | 40,802 | Cleveland |
| 1 3/4 | 96x240 | A572-50 | 55,888 | Cleveland |
| 2" | 96x240 | A572-50 | 130,068 | Cleveland |
| 2 1/4 | 96x240 | A572-50 | 45,300 | Cleveland |
| 3" | 96x240 | A36 | 48,080 | Cleveland |

GENERAL PURPOSE STEEL

LANCE CHATKIN   412-810-0222

MIKE MAZEROV   412-810-0228

DEAN SWANTEK   412-810-0225

Forward email

This email was sent to tina@wwsu.us by lance@gpsi4steel.com.

Update Profile/Email Address | Instant removal with SafeUnsubscribe™ | Privacy Policy.

GENERAL PURPOSE STEEL | 505 BRADDOCK AVE | TURTLE CREEK | PA | 15145

Email Marketing by

49.    Until recently, O'Neal was not aware that Worldwide was involved in any way with General Purpose, or that any of the steel purchased from Worldwide came from or through General Purpose. Although O'Neal did not know this at the time it entered into the transactions with Worldwide, all invoices for purchases of steel from Worldwide were prepared at General Purpose's offices in Turtle Creek, Pennsylvania.  These invoices were sent via U.S. Mail to O'Neal at its principal offices in Jefferson County, Alabama.  All payments for steel were directed from O'Neal's offices in Jefferson County, Alabama, to Worldwide via a lockbox in Turtle Creek, Pennsylvania, over which Lance Chatkin had control.

50.    Lance Chatkin, as President of both General Purpose and Worldwide, directed the activities of both entities.  Had O'Neal known that Lance Chatkin and General Purpose were involved in Worldwide's purportedly legitimate business, it would not have done business with their long-time salesman at Worldwide.

51.    In conducting its business with Worldwide, O'Neal has acted by and through its officers and employees in Jefferson County, Alabama.  Worldwide and its employees, in furtherance of the enterprise, communicated with O'Neal by

telephone, e-mail and through the U.S. Mail, directing telephone calls, e-mails and faxes, and sending letters, invoices and other documents to O'Neal at O'Neal's offices in Jefferson County, Alabama.  Worldwide has shipped products to O'Neal at O'Neal's facilities in Jefferson County, Alabama, and has shipped the products purchased by O'Neal by common carrier over the highways of the state of Alabama.

52.    Worldwide purchased at least one coil of steel from General Purpose that was located in the state of Alabama for resale to O'Neal.   Specifically, Worldwide purchased steel from General Purpose that was located at Ferralloy Southern in Decatur, Alabama, and shipped that steel to O'Neal in Birmingham, Alabama.

## Discovery and Details of Fraud

53.    On March 3, 2010, Ryan Murphy, an employee of Leeco, received a mill test report from Worldwide for a coil of steel that Leeco was planning to buy for a customer.  Mr. Murphy requested the mill test report prior to issuing a purchase order, which was not his normal practice, because he recently had concerns about the quality of unrelated steel of the same standard and grade.  The mill test report he received, which purported to come from steel manufacturer ArcelorMittal, was in an Excel spreadsheet format.  Mr. Murphy had never before

received a mill test report in an Excel spreadsheet format; all prior mill test reports he had received had been in a pdf format. The mill test report appeared to Mr. Murphy to have been electronically cut and pasted together and did not appear to be authentic. Mr. Murphy notified Leeco's President and CEO, Denton Nordhues, Leeco's Vice President, Jason Fredstrom, and Leeco's Vice President and CFO, Mark Krzmarzick, that the mill test report did not appear to be genuine.

54. On March 4, 2010, Mr. Murphy compared the Excel mill test report to another mill test report Leeco had received from Worldwide. During this comparison, Mr. Murphy noticed that the other mill test report, which was for discrete plate, had the same style as that for the coil steel and indicated that the plate was produced at ArcelorMittal's Indiana Harbor Mill. Mr. Murphy knew from past experience that ArcelorMittal did not produce steel plate of the indicated thickness at its Indiana Harbor Mill. As a result, Mr. Murphy asked Bob Wood, Leeco's Worldwide sales representative, for copies of all mill and laboratory test reports for all steel plate purchases. Mr. Murphy notified all Leeco personnel not to sell any more steel plate purchased from Worldwide and not to purchase any more steel plate from Worldwide.

55. On March 4 and March 5, 2010, Mr. Murphy had further conversations with Bob Wood attempting to obtain an explanation for the

25

apparently inauthentic mill test reports.  Mr. Murphy told Mr. Wood that the mill test reports did not appear authentic and that Leeco would reject the Worldwide plate.

56.    On March 9, 2010, Mr. Murphy received a copy of a letter from Lance Chatkin, President of both General Purpose and Worldwide, and majority owner of Worldwide, directed to Bruce Adelstein, Bob Wood, and Christina Nielsen at Worldwide.  This letter stated that it had come to the attention of General Purpose that certain steel General Purpose sold to Worldwide was sold by Worldwide to Leeco "with a [Mill] Test Report which differed in significant ways from the correct one submitted by General Purpose to Worldwide."  Mr. Chatkin noted that this raised "obvious concerns" that there might be other steel sold with "similarly incorrect Chemical Analyses" and acknowledged the "potential magnitude of the consequences which could occur as a result of such incorrect analyses being supplied to customers."  Mr. Chatkin asked that Worldwide "complete a thorough investigation."  The "correct" mill test reports that, according to Mr. Chatkin's letter, were submitted by General Purpose to Worldwide have never been produced by either Worldwide or General Purpose.

57.    In response to this letter, on March 10, 2010, Mr. Nordhues at Leeco requested that Mr. Chatkin and General Purpose provide Leeco with any mill test

reports, independent laboratory test results, chemical reports or other information in its possession pertaining to 36 specified heats and sizes of steel plate that Leeco had purchased from Worldwide, regardless of whether that information had been provided by General Purpose to Worldwide.

58.   On the same day, Mr. Nordhues requested that Bruce Adelstein at Worldwide provide Leeco with all test reports or other chemistry and lab reports or analyses, regardless of by whom prepared, related to 31 specified invoice numbers for steel plate invoiced to Leeco by Worldwide.

59.   On March 11, 2010, Bruce Adelstein and Bob Wood, on behalf of Worldwide, sent a letter to Mr. Nordhues stating that the manufacturer, ArcelorMittal, had requested return of all the steel plate Worldwide had sold to Leeco, referencing "contaminated heat" numbers, and refusing to provide additional information to Leeco.  Plaintiffs have since learned that the claim that ArcelorMittal had requested the return of the steel was false.

60.   On March 11, 2010, Mr. Chatkin sent a letter to Mr. Nordhues promising to provide Leeco all documentation General Purpose had provided to Worldwide when it sold the specified steel plate to Worldwide.

61.   Mr. Nordhues forwarded the Adelstein/Wood letter to Eric Smith at ArcelorMittal on March 11, 2010, requesting "the real story," and expressing

surprise at ArcelorMittal's demanding return of steel from Worldwide when it had been sold to General Purpose.  On March 12, 2010, Eric Smith wrote back to Mr. Nordhues to say that ArcelorMittal had provided only the following guidance, none of which was a demand, and none of which required return of the steel from Leeco: 1) "it is possible that the use of the steel could present a safety hazard if used based on the alleged characteristics shown in the incorrect certification"; 2) "Customers and customers' customers to whom the steel may have been sold should be promptly contacted and advised of any safety concerns for use based on the certificate"; and 3) "Because there may be legal actions or investigation, they may want to maintain the materials in a safe and secure location, but this is entirely their call."   It is not clear whether ArcelorMittal provided this guidance to Worldwide, to General Purpose, or to both entities.

62.    On March 15, 2010, Elizabeth Argier at Leeco wrote Bob Wood requesting the test reports for three heats.  On March 16, 2010, Heather Wagoner at Worldwide wrote to Mr. Nordhues and again stated that Worldwide did not want to provide additional documentation for the steel it sold to Leeco.

63.    On March 17, 2010, Mr. Nordhues wrote Mr. Adelstein and Mr. Wood at Worldwide to say that it had shipped over 220 tons of Worldwide discrete plate to over 20 customers, listing the heat numbers for steel already shipped to

customers for which information is needed, and demanding correct test reports by March 19, 2010.

64.    On March 17, 2010, Mr. Chatkin wrote Mr. Nordhues stating that all further inquiries should be directed to Worldwide.  Neither Mr. Chatkin nor General Purpose have provided any of the test reports or other documentation that it allegedly provided to Worldwide.

65.    On March 19, 2010, Worldwide provided Mr. Nordhues the ArcelorMittal bills of lading showing the chemical properties for sixteen heat numbers listed in Mr. Nordhues' letter of March 17, 2010.  Comparison of the chemical properties contained in the ArcelorMittal documents with the certificates of conformance or purported mill test reports provided by Worldwide at the time of purchase revealed that the chemical properties provided by the mill did not always match the chemical properties represented by Worldwide.

66.    Furthermore, in the letter accompanying these documents, Worldwide, through Mr. Adelstein, confirmed that <u>none</u> of the <u>physical</u> properties shown on the purported certificates of conformance or mill test reports supplied by Worldwide were supported by testing performed by the manufacturer or testing performed by an independent lab at the request of either Worldwide or General Purpose:

As for additional paperwork pertaining to the physicals shown for these plates, we have determined that all such information concerning the physical properties for these heat numbers listed in Exhibit A is unreliable,  Physical reports were determined by comparing several random test results that were done and applying them to the other heats based on the chemistries that were shown.

It is important that an independent test be done on each suspect heat number to determine exactly what the tensile, yield, and elongation are.

67.     Without actual physical test results, there can be no ASTM standard or grade assigned to the steel.  Therefore, without supporting physical test results, all of the representations by Worldwide, General Purpose, Chatkin and Adelstein as to the supposed standards and grades of steel being sold to O'Neal and Leeco, whether made directly or through Tom Macino or Bob Wood, were false.  These misrepresentations included not only the false mill test reports and certificates of conformance for each purchase made by O'Neal and Leeco, but also every response to request for bid and invoice for each purchase, as each of these communications included ASTM standards and grades information for which there was no support whatsoever.

68.     On March 11, 2010, upon learning of the misrepresentations made to Leeco by Worldwide about the discrete plate steel, Jodi Parnell at O'Neal decided to test the steel cut from coil which O'Neal had purchased from Worldwide.  Ms.

Parnell had samples from such steel which was still at O'Neal's warehouse in Birmingham tested by an independent laboratory.

69.    The steel O'Neal initially tested was represented by Worldwide to be shown on a mill test report or on an independent laboratory test in Worldwide's possession as ASTM A656 Grade 80 steel.  At the time of purchase, Worldwide had provided O'Neal a certificate of conformance certifying that Worldwide had either a mill test report or independent lab test results showing the steel to meet the ASTM A656 Grade 80 yield requirement of 80,000 psi, with the actual yield strength for the steel based on the results of physical tests stated on the certificate of conformance delivered with the steel as 82,100 psi.  O'Neal's post-discovery independent test results revealed that the steel did not meet the ASTM yield requirement as represented by Worldwide, but instead had a yield strength of only 63,300 psi.

70.    On March 12, 2010, after learning that the Grade 80 steel had failed to meet the represented specifications, Ms. Parnell called Tom Macino, O'Neal's sales representative at Worldwide, and requested copies of mill test reports and independent lab tests on all of O'Neal's steel purchases from Worldwide.

71.    On March 16, 2010, Mr. Macino called Ms. Parnell and told her that something was terribly wrong, that he had been selling steel that had been

represented to him by others as being something it was not, and that he was stunned by the revelation. Mr. Macino said that General Purpose provided all of the analysis, including physical test data, on which he had based his sales to O'Neal. However, after Ms. Parnell brought the issue of the failed A656 Grade 80 steel to his attention on March 12, 2010, Mr. Macino called General Purpose and asked for the actual physical test data from the lab, assuming that General Purpose had made some mistake. Mr. Macino reported to Ms. Parnell that he was not able to get anyone to provide him with the test results he had requested, causing him to believe that no tests were ever run and that the steel sold by Worldwide had never been tested. Mr. Macino recommended quarantining all the material that O'Neal still had on hand since he could find no evidence that it had ever been properly tested.

72. After this telephone conversation with Mr. Macino, Ms. Parnell was informed the same day that another batch of steel, cut from coil, and represented to be ASTM A1011 Grade 50, had "failed testing in a big way." ASTM standards require, among other things, that this steel have a yield strength of 50,000 psi, and the certificate of conformance represented that physical tests resulted in a yield strength of 52,600 psi. However, independent physical testing revealed that the steel actually had a yield strength of 34,500 psi.

73.     Despite Mr. Macino's representation that he could find no test data to support the false certificates of conformance, whether at General Purpose or at Worldwide, Mr. Macino later told Ms. Parnell that he was looking for the testing information and that he had in fact found it.  Specifically, on March 18, 2010, Ms. Parnell called the main number at Worldwide.  The phone was answered by Mr. Macino, who told her that they were pulling the testing information together but that he did not have it yet.  On March 30, 2010, Mr. Macino told Ms. Parnell that they had all of the testing data, but that it was spread out between two conference rooms and that Lance Chatkin, among others, was trying to match the test results to the purchase orders.   No test results supporting the false certificates of conformance were ever provided to O'Neal.

74.     Subsequently, Rich Kuny revealed that, upon his joining Worldwide in September 2009, and at the direction of Bruce Adelstein, he began to regularly prepare certificates of conformance to accompany the steel purchased by O'Neal and Leeco from Worldwide.   At times the information in the certificates of conformance was based upon information provided by General Purpose employees, including Dick Diamondstone, or in the General Purpose inventory system, but at other times the information was wholly fabricated to match customer specifications.  Prior to Mr. Kuny's arrival at Worldwide in September 2009, Mr.

Kuny revealed that the certificates of conformance provided to O'Neal and Leeco were prepared by Mr. Diamondstone at General Purpose.  According to Mr. Kuny, Mr. Adelstein chose the steel used to fulfill each order, and Mr. Kuny was instructed by Mr. Adelstein to fill in the certificates of conformance so that the physical and chemical properties shown met the customer's specifications, regardless of the steel's actual properties.

75.    All of the certificates of conformance and mill test reports provided by Worldwide to O'Neal and to Leeco were false, in that they purported to represent the results of physical testing performed upon the steel sold by Worldwide that was never performed.

76.    After discovering that some of the steel it purchased from Worldwide did not meet the specifications represented on the respective certificates of conformance, O'Neal began having all of the steel that it had purchased from Worldwide and which was still in O'Neal's warehouses or located at customers' facilities and available tested at independent test labs.  To date, approximately 60% of the steel tested by O'Neal has failed to meet the specifications represented by Worldwide on the certificates of conformance provided to O'Neal.

77.    Likewise, already aware the plate steel obtained from Worldwide did not conform, Leeco began having any coil steel it purchased from Worldwide that

34

was available for testing independently tested.  Of the steel tested by Leeco, approximately 40% has failed to meet the specifications represented by Worldwide on the certificates of conformance provided to Leeco.

78.     The results of the independent tests performed by O'Neal and Leeco revealed that the actual physical and chemical properties of the steel differed materially from those required by the ASTM standards and grades of steel O'Neal and Leeco thought they were buying, and from the standards, grades and physical and chemical properties represented on the certificates of conformance or mill test reports provided by Worldwide.

79.     For example, physical tests performed on steel purchased by O'Neal from Worldwide pursuant to the following purchase orders revealed that the steel failed to meet the yield strength necessary to certify the steel as meeting the indicated ASTM standards and grades, and as represented on Worldwide's certificates of conformance, which were therefore demonstrably false:

| PO # | PO Date | PO Specs | ASTM Required Yield[6] | WW Cert. Yield | Actual Tested Yield |
|------|---------|----------|-----------------------|----------------|---------------------|
| 2198206 -OP-230 | 7/17/09 | Plate A572G50 | 50,000 psi | 63,700 psi | 42,700 psi |
| 2199837 -OP-119 | 8/4/09 | Sheet A1011 HSLAS GR50 | 50,000 psi | 54,000 psi | 39,800 psi |

---

[6] ASTM standards specify this as the minimum required yield strength.

| PO # | PO Date | PO Specs | ASTM Required Yield[6] | WW Cert. Yield | Actual Tested Yield |
|---|---|---|---|---|---|
| 2200839 -OP-222 | 8/12/09 | Sheet A656G80 | 80,000 psi | 84,500 | 71,700 psi |
| 2207061 -OP-119 | 10/20/09 | Plate A572G50 TYII | 50,000 psi | 56,200 psi | 43,700 psi and 46,100 psi |
| 2212255 -OP-119 | 12/27/09 | Plate A572GR50 TYII | 50,000 psi | 56,200 psi | 47,400 psi and 52,400 psi |
| 2210877 -OP-230 | 12/7/09 | Plate A572G60 Tmpr pass | 60,000 psi | 62,600 psi | 48,600 psi |
| 2212201 -OP-119 | 12/23/09 | Plate A656-70 Type 3 | 70,000 psi | 76,200 psi | 59,900 - 63,900 psi |
| 2212201 -OP-119 | 12/23/09 | Plate A656-70 Type 3 | 70,000 psi | 73,200 psi | 56,900 - 61,600 psi |
| 2212201 -OP-119 | 12/23/09 | Plate A656-70 Type 3 | 70,000 psi | 73,100 psi | 48,400 - 52,000 psi |
| 2212202 -OP-119 | 12/23/09 | Plate A1018 Gr70 TY | 70,000 psi | 77,800 psi | 51,300 psi |
| 2212205 -OP-119 | 12/23/09 | Plate A572G50 TYII | 50,000 psi | 56,200 psi | 43,700 psi |
| 2212217 -OP-128 | 12/29/09 | Plate A656G80 | 80,000 psi | 94,200 psi | 66,000 psi |
| 2213828 -OP-230 | 1/18/10 | Plate A572GR60 | 60,000 psi | 62,000 psi | 43,800 psi |
| 2213876 -OP-230 | 1/18/10 | Plate A572G60 | 60,000 psi | 62,400 psi | 41,800 psi |
| 2214400 -OP-230 | 1/21/10 | Plate A572GR60 | 60,000 psi | 63,000 psi | 54,900 psi |
| 2214527 -OP-101 | 1/22/10 | Sheet A1011 HSLAS GR50 | 50,000 psi | 52,600 psi | 34,500 psi |
| 2214814 -OP-244 | 1/26/10 | Plate A656G80 | 80,000 psi | 82,400 psi | 59,500 psi |
| 2215225 -OP-135 | 1/29/10 | Plate A572G50 | 50,000 psi | 52,400 psi | 38,500 psi |
| 2216011 -OP-230 | 2/5/10 | Plate A572GR60 Tmpr pass | 60,000 psi | 64,300 psi | 43,000 psi |

| PO # | PO Date | PO Specs | ASTM Required Yield[6] | WW Cert. Yield | Actual Tested Yield |
|---|---|---|---|---|---|
| 2216012 -OP-230 | 2/5/10 | Plate A572GR60 | 60,000 psi | 62,800 psi | 43,700 psi |
| 2217077 -OP-224 | 2/17/10 | A1011 HSLA-F GR80 | 80,000 psi | 82,600 psi | 56,300 psi |
| 2217296 -OP-230 | 2/18/10 | A572G60 | 60,000 psi | 62,000 psi | 38,300 psi |
| 2217394 -OP-119 | 2/19/10 | Plate A656G80 | 80,000 psi | 82,100 psi | 67,800 psi (3/8" material) |
| 2217852 -OP-101 | 2/24/10 | Plate GR80 | 80,000 psi | 82,100 psi | 67,800 psi (3/8" material) |
| 2218521 -OP-244 | 3/2/10 | Plate A656G80 | 80,000 psi | 83,200 psi | 64,500 psi |
| 2218521 -OP-244 | 3/2/10 | Plate A656G80 | 80,000 psi | 84,200 psi | 71,500 psi |
| 2218882 -OP | 3/5/10 | Plate A656G80 | 80,000 psi | 82,800 psi | 69,000 psi |

80.    In addition, chemical tests performed on steel purchased by O'Neal from Worldwide pursuant to the following purchase orders failed to meet the copper content required by the customer and represented on Worldwide's certificates of conformance, which were therefore demonstrably false. O'Neal's customer for this steel intended it to be used in rail freight cars, and it was essential, as specified in the purchase orders, that the copper content of the steel be greater than .20. As the test results demonstrate, the actual copper content, which was provided to General Purpose by the mills, was much lower than represented:

| PO # | PO Date | PO Specs | Worldwide Certified Copper Content | Actual Copper Content |
|---|---|---|---|---|
| 2197868-OP-119 | 7/15/09 | Plate A36 with .20 Min Cu. | .210 | <.01 |
| 2197868-OP-119 | 7/15/09 | Plate A36 with .20 Min Cu. | .220 | .01 |
| 2197868-OP-119 | 7/15/09 | Plate A36 with .20 Min Cu. | .200 | .05 |
| 2197868-OP-119 | 7/15/09 | Plate A36 with .20 Min Cu. | .210 | .08 |
| 2197868-OP-119 | 7/15/09 | Plate A36 with .20 Min Cu. | .220 | .09 |
| 2197780-OP-119 | 7/14/09 | Plate A36 with .20 Min Cu | .210 | .08 |
| 2207061-OP-119 | 10/20/09 | Plate A572G50 Type II with .20 Min Cu | .25 | .010 |
| 2197780-OP-119 | 7/14/09 | Plate A36 with .20 Min Cu | .220 | .010 |
| 2197775-OP-119 | 7/14/09 | Plate A36 with .20 Min Cu | .220 | .010 |
| 2197775-OP-119 | 7/14/09 | Plate A36 with .20 Min Cu | .21 | .03 |
| 2197776-OP-119 | 7/14/09 | Plate A36 with .20 Min Cu | .21 | .03 |
| 2197776-OP-119 | 7/14/09 | Plate A36 with .20 Min Cu | .228 | .01 |
| 2197774-OP-119 | 7/14/09 | Plate A36 with .20 Min Cu | .224 | .070 |
| 2206982-OP-119 | 10/20/09 | Plate A572 GR 50 with .20 Min Cu | .25 | .011 |
| 2206983-OP-119 | 10/20/09 | Plate A36 with .20 Min Cu | .25 | .012 |
| 2197777-OP-119 | 7/14/09 | Plate A36 with .20 Min Cu | .210 | <.02 |

| PO # | PO Date | PO Specs | Worldwide Certified Copper Content | Actual Copper Content |
|---|---|---|---|---|
| 2197771-OP--119 | 7/14/09 | Plate A36 with .20 Min Cu | .210 | <.02 |
| 2199559-OP-119 | 7/31/09 | Plate A36 with .20 Min Cu | .210 | .120 |
| 2206980-OP-119 | 10/20/09 | Plate A36 with .20 Min Cu | .25 | .12 |
| 2206985-OP-229 | 10/20/09 | Plate A36 with .20 Min Cu | .23 | .08 |
| 2193953-OP-229 | 6/3/09 | Plate 572-50 with .20 Min Cu | .208 | .07 |
| 2193953-OP-229 | 6/3/09 | Plate 572-50 with .20 Min Cu | .211 | .06 |
| 2206979-OP-119 | 10/20/09 | Plate A36 with .20 Min Cu | .24 | .08 |

81.     Likewise, physical tests performed on steel purchased by Leeco from Worldwide pursuant to the following purchase orders revealed that the steel failed to meet the yield strength necessary to certify the steel as meeting the indicated ASTM standards and grades and represented on Worldwide's certificates of conformance, which were therefore demonstrably false:

| PO # | PO Date | PO Specs | ASTM Required Yield | Worldwide Certified Yield | Actual Tested Yield |
|---|---|---|---|---|---|
| M478 | 6/19/09 | 100 XF 100PSI-AR | 100,000 psi | 101,300 psi | 87,200 psi |
| M744 | 7/19/09 | 100 XF 100PSI-AR | 100,000 psi | 103,800 psi | 74,300 psi |

| PO # | PO Date | PO Specs | ASTM Required Yield | Worldwide Certified Yield | Actual Tested Yield |
|---|---|---|---|---|---|
| M744 | 7/19/09 | 100 XF 100PSI-AR | 100,000 psi | 102,800 psi | 82,100 psi and 87,100 psi |
| N230 | 2/9/10 | A656 GR 80 | 80,000 psi | 82,100 psi | 69,900 psi |
| M1047 | 11/6/09 | A656 GR 80 | 80,000 psi | 86,200 psi | 51,800 - 52,800 psi |
| M598 | 7/20/09 | A656 GR 80 | 80,000 psi | 89,700 psi | 73,400 psi; 59,000 psi; 60,800 psi |
| N026 | 1/7/10 | A656 GR 80 | 80,000 psi | 82,300 psi | 62,600 psi |
| M687 | 8/7/09 | A656 GR 80 | 80,000 psi | 83,100 psi | 71,000 psi |
| M1013 | 10/22/09 | 100 XF 100PSI-AR | 100,000 psi | 103,000 psi | 84,500 psi |
| M864 | 9/14/09 | 100 XF 100PSI-AR | 100,000 psi | 103,600 psi | 91,900 psi 83,100 psi |
| M527 | 7/1/09 | 100XF 100PSI-AR | 100,000 psi | 100,900 psi | 86,100 psi |

82.   Furthermore, information provided by the purported manufacturer, ArcelorMittal, confirmed that the mill test reports supplied by Worldwide to Leeco for the following heat numbers were wholly fabricated:

| PO# | PO Date | PO Specs | Heat # |
|---|---|---|---|
| M689 | 8/10/09 | A656 GR 80 | 25612 |
| N108 | 1/20/10 | A1011 GR 55 | C50981 |
| N118 | 1/21/10 | A36: HR Plate | H8019 |
| N117 | 1/21/10 | ASTM A572-50: Discrete Plate | D7428 |
| N116 | 1/21/10 | A36: Plate | R0396 |
| N119 | 1/21/10 | ASTM A572-50: Discrete Plate | D7638 |
| N116 | 1/21/10 | A36: Discrete Plate | R0961 |
| N151 | 1/27/10 | ASTM A572-50: Discrete Plate | D9451 |

| PO# | PO Date | PO Specs | Heat # |
|---|---|---|---|
| N152 | 1/27/10 | A36: HR Plate | H8038 |
| N151 | 1/27/10 | 572-50: Steel Plates | D8975 |
| N152 | 1/27/10 | A36: Discrete Plate | R0961 |
| No PO (was for steel Leeco was contemplating purchasing) | 3/03/10 | HR HY 80: High Strength Low Alloy Hot Band | 98215 |

83.     The   independent   testing   performed   by   O'Neal   and   Leeco
demonstrated that most of the steel provided to Leeco and O'Neal by General
Purpose, through Worldwide, failed to meet the specifications on O'Neal's and
Leeco's purchase orders, which were the specifications required by O'Neal's and
Leeco's customers, and the specifications represented and warranted by
Defendants.

84.     Neither O'Neal nor Leeco would have purchased steel that did not
meet their customer's specification.  Plaintiffs reasonably relied on the information
provided by Worldwide, General Purpose, Chatkin and Adelstein in purchasing the
steel.

85.     By falsifying the mill test reports and certificates of conformance
provided to O'Neal and Leeco, both Worldwide and General Purpose, in addition
to Lance Chatkin and Bruce Adelstein, were able to sell inferior, untested product

as substantially better and more expensive product, meeting exacting ASTM specifications, thus generating illicit profits for themselves.

86.     Had O'Neal and Leeco not discovered these false mill test reports and certificates of conformance, Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein would have continued to perpetuate their enterprise, as this was their established method of doing business.

87.     In fact, General Purpose and Chatkin supplied another customer of General Purpose, Brownsville Marine, directly with totally fabricated mill test reports that were identical in form to the mill test reports provided to Leeco through Worldwide.  In October 2009, Brownsville Marine received a total of 24 fabricated mill test reports sent by General Purpose and Chatkin.  Brownsville Marine tested the steel and some specifications differed from those on the mill test reports provided by General Purpose.  These mill test reports, which were demonstrably false according to the manufacturer of the steel, ArcelorMittal, permitted General Purpose and Chatkin in that instance to convince a customer to purchase inferior steel at an inflated price, thus permitting General Purpose and Chatkin to reap the profits.

**Damages**

88.    The steel purchased by O'Neal and Leeco from Worldwide since May 2009 was sold to customers for use in a variety of products.  A large portion of the steel O'Neal and Leeco thought they were purchasing from Worldwide was intended and represented to be HSLA steel which is for use in applications where strength is crucial.  Worldwide was aware that O'Neal and Leeco were purchasing the steel for resale and that it was imperative that the steel meet the required standards and grades to be sufficient for the application for which the steel would be used.  As stated, steel of this nature is used in applications where the quality and strength of the steel is crucial.  For example, some of the steel was re-sold by O'Neal and Leeco for use in military Humvees and armored vehicles.   These vehicles were deployed to Afghanistan, Iraq and Israel; use of inferior, untested steel in these vehicles put the lives of U.S. Military personnel serving in these countries at risk.  Other steel was sold for use in the booms on bucket trucks and in the ladders on hook and ladder fire trucks.  Still other steel was sold for use in railroad freight cars.  The conduct of Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein could have had significant impact upon the military personnel, fire fighters, and other end users of the products if the steel had failed in the field because it was not of the standards and grades represented.

89.    To further compound the damages incurred by O'Neal and Leeco, many of O'Neal's and Leeco's customers lost traceability of the steel once it reached a certain point in the manufacturing process.  At this point, O'Neal's and Leeco's customers could no longer determine into which finished products the potentially defective steel was incorporated.  The only recourse was to recall and replace[7] or test all products that could have been manufactured with the Worldwide/General Purpose steel — a very expensive process for which O'Neal and Leeco have borne a heavy burden.

90.    O'Neal and Leeco have incurred significant damages in testing the steel purchased from Worldwide and in testing or replacing the products made (or that could have been made) from the Worldwide/General Purpose steel.  O'Neal has also incurred significant damages in procuring replacement steel at a higher price to supply to customers.

91.    To date, O'Neal and Leeco have been forced to resolve potential claims with their customers totaling in excess of $5,500,000.00 by virtue of O'Neal's and Leeco's providing potentially non-conforming steel purchased from Worldwide in violation of the contracts with their customers.  As early as April 5, 2010, O'Neal wrote to Worldwide instructing Worldwide that, although the full

---

[7] In some cases replacement was the best option, since testing either would weaken the integrity of the products, would be more expensive than testing or would be inconclusive.

impact of the situation was not yet known, O'Neal would hold Worldwide responsible for all costs incurred by O'Neal and by O'Neal's customers.  O'Neal received no response.[8]

92.    Counsel for O'Neal and Leeco formalized this position with a letter to counsel for General Purpose and Worldwide on May 12, 2010, informing them of the magnitude of damages suffered by Plaintiffs' customers and inviting both entities to participate in communicating with customers regarding resolution of those claims.    O'Neal and Leeco received no response other than a denial of liability.  O'Neal and Leeco then proceeded to finalize the resolution of the claims of their customers.  The total amount of this resolution does not reflect the total amount of O'Neal's and Leeco's exposure and potential damages, as Leeco and O'Neal may be exposed to liability by virtue of other non-conforming steel that may be incorporated into end products of other customers to an extent not yet known.

93.    In addition to the above damages, the conduct of Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein has been damaging to the business reputations of O'Neal and Leeco, as they have had to inform all of their customers

---

[8] In fact, sometime after April 5, 2010, a salesman for O'Neal drove past the Worldwide office in Cleveland, Ohio, and found that the office was closed, with signs of a hasty departure.  O'Neal and Leeco subsequently discovered that Worldwide, to the extent it continued operations, was using the offices of General Purpose in Pittsburgh, Pennsylvania.

to which the Worldwide/General Purpose steel was sold about the non-conforming steel. This may result in loss of future business and loss of profits to O'Neal and Leeco.

## COUNT I—RICO VIOLATION UNDER 18 U.S.C. § 1964(c)

94. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 93 as if fully set forth herein.

95. RICO, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, provides a private civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

96. At all relevant times, O'Neal and Leeco were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

97. Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

98. At all relevant times, Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

99.    At all relevant times, Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein, together with Rich Kuny, Tom Macino, Bob Wood, Christina Nielsen, Von Argyle and Dick Diamondstone, among others, formed an association-in-fact enterprise as defined by 18 U.S.C. § 1961(4) that was and is engaged in, and its activities affect, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).   The structure and purpose of the enterprise involved the sale and distribution of inferior, untested steel nationwide. In addition to its legal and legitimate activities, if any, the enterprise was used by Defendants for racketeering activity through a pattern of sending fraudulent certificates of conformance and mill test reports through mail and wire causing injury to the property and business of Plaintiffs.

100.   Due to the sale of inferior, untested steel represented to be of a certain, higher quality and the savings from not performing the required tests on the steel, the enterprise profited from its activities.   Each member of the association-in-fact enterprise had a common goal and purpose of making money from the sale and distribution of fraudulently certified steel.

101.   At all relevant times, each Defendant, as a result of position and control, was able to participate in the operation and management of the enterprise by directing its affairs.

102. Each Defendant worked together in distributing steel to Plaintiffs while creating fraudulent certificates of conformance and mill test reports as stated above.

103. At all relevant times, Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1962(c).

104. Specifically, Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud). Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein each committed, directed or approved the commission of two or more of these acts of racketeering activity.

105. Each act of mail or wire fraud, as set forth in the facts, was sent by, directed or approved by Defendants providing fraudulent certifications and test results sent and relied on by Plaintiffs which crossed state lines from various states into Alabama.

106.   The above facts demonstrate Defendants knowingly devised and participated in a scheme to defraud Plaintiffs, this was done willingly with an intent to defraud, and Defendants used the United States mails and interstate wires for the purpose of executing the scheme.

107.   The acts referred to constituted a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants, common victims, a common method of commission (fraudulent certificates of conformance and mill test reports), and the common purpose and common result of the racketeering activities being interrelated by distinguishing characteristics.  The predicate acts committed by Defendants had the common purpose and common result of inducing Plaintiffs to accept inferior, untested steel through the method of falsifying mill test reports and certificates of conformance transported through mail or wire in order to profit financially.

108.   The predicate acts referred to above constituted a "pattern of racketeering activity" and demonstrate continuity.  Defendants committed multiple acts of mail and wire fraud over a substantial amount of time as demonstrated by the communications specified above.

109.   Defendants mailed and wired fraudulent mill test reports, certificates of conformance and invoices to Plaintiffs on numerous occasions as specified in the facts above.

110.   Defendants furthered their fraudulent scheme after inquiry from Plaintiffs by having telephone conversations and by sending emails, facsimiles or letters giving fraudulent explanations and fraudulently omitting material facts in their communications which caused Plaintiffs further damage by causing Plaintiffs to delay in communicating with their customers the extent of the situation.

111.   If not for the awareness of Leeco in uncovering the pattern of racketeering activity, the actions of Defendants would still continue against O'Neal, Leeco and others.  Defendants had no intention to stop the pattern of racketeering activity until O'Neal and Leeco discovered the activities.  As stated above, at least one other third party, Brownsville Marine, has been harmed in similar ways by members of the enterprise further evidencing that such racketeering activities are a "way of business" by the enterprise and its members.

112.   O'Neal and Leeco relied upon the misrepresentations and omissions directed at Plaintiffs by Defendants as part of their pattern of racketeering activity, and as a direct result suffered damage to their business and property.

113.   Lance Chatkin, as majority owner of Worldwide and in his official capacity as President of General Purpose and of Worldwide, directly and indirectly conducted the racketeering activities through the enterprise by directing the communication through mail or wire and furnishing the false information through Rich Kuny, Dick Diamondstone and others.

114.   Bruce Adelstein, as an acting representative of Worldwide, knowingly and directly or indirectly conducted the racketeering activities through the enterprise by directly or indirectly sending, or approving the sending of, fraudulent representations through the mail or by wire to Plaintiffs and directing Rich Kuny and others to do so.

115.   Worldwide and General Purpose, through their executives, managers, employees and agents, failed to perform the required testing on steel product sold to Plaintiffs and then committed predicate acts under RICO by sending false information and test results through the mail or by wire.

116.   Plaintiffs have incurred injury to their business or property by having to replace the inferior, untested steel distributed by Defendants as a result of the racketeering activities or by having to compensate their customers for damages sustained by virtue of nonconforming, or potentially nonconforming, steel already incorporated into final products.   Plaintiffs have further suffered loss to their

business through the embarrassment and injury to reputation and goodwill that they have worked for so many years to achieve through relationships with their customers.

117.   The injury to Plaintiffs' business or property was proximately caused by Defendants' pattern of racketeering activity.   Each act of mail or wire fraud caused further injury to Plaintiffs' business or property due to the reliance on the falsity of the certificates of conformance and mill test reports.

118.   As a direct and proximate cause of Defendants' actions in violation of 18 U.S.C. § 1962(c), Plaintiffs have been and continue to be injured in their business and property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which sum is to be duly trebled in accordance with 18 U.S.C. § 1964.

119.   Plaintiffs are entitled to recover reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## COUNT II—RICO CONSPIRACY UNDER 18 U.S.C. § 1964(c)

120.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 119 as if fully set forth herein.

121.   Plaintiffs are informed and believe and on that basis allege that Defendants' actions and conduct, and their agents' actions and conduct, as alleged

herein were at all times known to the officers, directors, executives, supervisors, managers and authorized agents of the each of the corporate Defendants, and were at all times known to the individual Defendants, but, that Defendants nevertheless engaged in such conduct, and further, that each Defendant knowingly and intentionally permitted and acquiesced in such conduct on the part of each other Defendant, and in the conduct of the employees, servants, and agents of each other Defendant.  Plaintiffs are further informed and believe and on that basis allege that Defendants had advance knowledge of the false mill test reports and certificates of conformance, and of their transmission to Plaintiffs in order to induce the sale of inferior, untested steel, and continued to allow such actions to continue by disregarding the fraudulent activity and jeopardizing the safety of others.

122.  As stated in the facts set forth above, Defendants agreed to and directed that the racketeering activity of mail and wire fraud would be conducted by the association-in-fact enterprise.  Such agreement is evidenced by the revelation of Rich Kuny that Bruce Adelstein of Worldwide directed him to prepare false certificates of conformance based upon information provided by General Purpose and its employees, including Dick Diamondstone.  Such agreement is also evidenced by the fact that Lance Chatkin, on behalf of General Purpose, prepared and transmitted to Worldwide false information regarding

purported standards and grades of steel, for which no actual supporting testing existed, with the intent that Worldwide transmit this false information to Leeco to induce Leeco to purchase the steel.

123.   18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity.  18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate [18 U.S.C. § 1962(c)]."  Hence, 18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

124.   Defendants conspired and agreed with each other to engage in the conduct, or attempted conduct, stated above, and also conspired and agreed to aid each other in the commission of the acts of mail and wire fraud as stated above.

125.   Defendants conspired, planned and schemed to conduct the affairs of the association-in-fact enterprise through a pattern of racketeering activity by committing multiple acts of mail and wire fraud in violation of 18 U.S.C. § 1962(c).

126.  Each Defendant combined, conspired and confederated with each other to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

54

127.   As a direct and proximate cause of Defendants' actions in violation of 18 U.S.C. § 1962(d), Plaintiffs have been and continue to be injured in their business and property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which sum is to be duly trebled in accordance with 18 U.S.C. § 1964.

128.   Plaintiffs are entitled to recover reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## COUNT III—FRAUDULENT MISREPRESENTATION

129.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 128 as if fully set forth herein.

130.   Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein falsely represented to O'Neal and Leeco that Worldwide was supplying steel in accordance with the specifications required.

131.   As detailed above, Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein provided to O'Neal and Leeco fabricated and false certificates of conformance and mill test reports which indicated that the steel did, in fact, meet the specifications.

132.   The representations made by Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein were made willfully to deceive or recklessly without knowledge.

133.   O'Neal and Leeco reasonably relied upon the representations made by Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein and have been damaged as a result.

134.   O'Neal and Leeco seek an award of compensatory and punitive damages for Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein's fraudulent conduct, and any other damages permitted by law.

## COUNT IV—NEGLIGENCE AND/OR WANTONNESS AGAINST WORLDWIDE

135.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 134 as if fully set forth herein.

136.   Worldwide had a duty to ensure that the steel that it was supplying to O'Neal and Leeco met the specifications required and which Worldwide represented the steel met.

137.   Worldwide acted negligently and/or wantonly in failing to supply O'Neal and Leeco with conforming steel.

138.   Worldwide acted negligently and/or wantonly in failing to test the steel prior to shipping.

139.   Worldwide acted negligently and/or wantonly by supplying O'Neal and Leeco with incorrect certificates of conformance and mill test reports, or Worldwide acted wantonly, recklessly or intentionally by supplying O'Neal and Leeco with fabricated and falsified certificates of conformance and mill test reports.

140.   O'Neal and Leeco have been damaged as a proximate cause of Worldwide's negligent, wanton, reckless and/or intentional conduct.

141.   O'Neal and Leeco seek an award of compensatory and punitive damages for Worldwide's conduct, and any other damages permitted by law.

## COUNT V—NEGLIGENCE AND/OR WANTONNESS AGAINST GENERAL PURPOSE

142.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 141 as if fully set forth herein.

143.   General Purpose had a duty to ensure that the steel that it was supplying to Worldwide to fulfill orders placed by O'Neal and Leeco met the specifications required and which General Purpose represented the steel met.

144.   General Purpose acted negligently and/or wantonly in failing to supply Worldwide with steel conforming to O'Neal's and Leeco's specifications.

145.   General Purpose acted negligently and/or wantonly in failing to test the steel prior to shipping.

146.   General Purpose acted negligently and/or wantonly in invoicing O'Neal and Leeco for steel that did not conform to O'Neal's and Leeco's specifications, and for representing on those invoices that the steel did, in fact, meet the specifications.

147.   General Purpose acted negligently and/or wantonly in collecting money from O'Neal and Leeco for steel that did not conform to O'Neal's and Leeco's specifications.

148.   O'Neal and Leeco have been damaged as a proximate cause of General Purpose's negligent, wanton, reckless and/or intentional conduct.

149.   O'Neal and Leeco seek an award of compensatory and punitive damages for General Purpose's conduct, and any other damages permitted by law.

## <u>COUNT VI—CIVIL CONSPIRACY</u>

150.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 149 as if fully set forth herein.

151.   Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein conspired together to unlawfully, and with malice aforethought, defraud O'Neal and Leeco by providing to O'Neal and Leeco fabricated and false certificates of conformance and mill test reports which represented that the steel covered by the certificates of conformance or mill test reports met O'Neal's and Leeco's specifications for purchase.

152.   O'Neal and Leeco reasonably relied upon the unlawful, fraudulent representations made by Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein and have been damaged as a result.

153.   O'Neal and Leeco seek an award of compensatory and punitive damages for Worldwide, General Purpose, Lance Chatkin and Bruce Adelstein's conspiracy to commit unlawful, fraudulent conduct, and any other damages permitted by law.

## COUNT VII—BREACH OF CONTRACT

154.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 153 as if fully set forth herein.

155.   In accepting and filling the purchase orders from O'Neal and Leeco, Worldwide contracted and agreed to supply steel which met the specifications stated therein.

156.   Worldwide has breached these contracts by failing to supply O'Neal and Leeco with steel meeting the specifications required and by falsely representing that the steel did meet the specifications.

157.   As a result of Worldwide's breach, O'Neal and Leeco have incurred substantial damages and expect to incur additional damages in the future, as set forth above.

158.   O'Neal and Leeco seek an award of compensatory, incidental, and consequential damages for Worldwide's conduct, and any other damages permitted by law.

## <u>COUNT VIII—BREACH OF EXPRESS WARRANTY</u>

159.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 158 as if fully set forth herein.

160.   Worldwide expressly warranted to O'Neal and Leeco that the steel sold by Worldwide to them met the specifications required, and such express warranty became part of the basis of the bargain.

161.   Worldwide has breached its express warranty by supplying O'Neal and Leeco with defective and nonconforming goods which do not meet the specifications represented.

60

162.   O'Neal and Leeco have been damaged by the breach and seek an award of compensatory, incidental and consequential damages, and any other damages permitted by law.

## COUNT IX—BREACH OF IMPLIED WARRANTIES

163.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 162 as if fully set forth herein.

164.   Pursuant to the Uniform Commercial Code, within each sale of goods is implied the warranty of merchantability and the warranty of fitness for a particular purpose.

165.   Worldwide failed to supply O'Neal and Leeco with goods that are merchantable or fit for the particular purposes for which they are used.

166.   Worldwide failed to supply O'Neal and Leeco with goods that are fit for their particular purpose by failing to supply goods which met the required standards or grades.

167.   Worldwide breached these implied warranties by supplying O'Neal and Leeco with non-conforming, defective product that did not meet the specifications and requirements.

168.   O'Neal and Leeco have been damaged by the breach and seek an award of compensatory, incidental and consequential damages, and any other damages permitted by law.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs O'Neal Steel, Inc., and Leeco Steel, LLC, demand judgment on the foregoing counts against Defendants Worldwide Steel Unlimited, Inc., General Purpose Steel, Inc., Lance Chatkin and Bruce Adelstein:

(a) awarding compensatory damages in an amount to be determined upon trial of this action, but not less than $5,500,000.00, plus

(b) treble damages pursuant to 18 U.S.C. § 1964;

(c) incidental, consequential, and punitive damages;

(d) costs, attorneys' fees, and expenses;

(e) prejudgment interest; and

(f) awarding such further and different relief as the Court deems just.

## COUNT X—DECLARATORY JUDGMENT

169.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 168 as if fully set forth herein.

170.   Defendants Worldwide, General Purpose, Chatkin and Adelstein supplied defective product to O'Neal and Leeco, which O'Neal and Leeco then sold to its customers.

171.   O'Neal and Leeco were induced to act by the misrepresentations made by Defendants Worldwide, General Purpose, Chatkin and Adelstein, upon which O'Neal and Leeco justifiably and reasonably relied.

172.   O'Neal and Leeco are not guilty of any fault.  Instead, the fault of Defendants Worldwide, General Purpose, Chatkin and Adelstein was the efficient cause of all injury both to O'Neal and Leeco and to O'Neal's and Leeco's customers and to any third-party users who might be injured by non-conforming steel incorporated into end products.

173.   O'Neal and Leeco have been forced to resolve potential claims with their customers by virtue of O'Neal's and Leeco's provision of potentially non-conforming steel in violation of the contracts with their customers.

174.   As early as April 5, 2010, O'Neal wrote to Worldwide instructing Worldwide that, although the full impact of the situation was not yet known, O'Neal would hold Worldwide responsible for all costs incurred by O'Neal and by O'Neal's customers.  O'Neal received no response.

175.   Counsel for O'Neal and Leeco formalized this position with a letter to counsel for General Purpose and Worldwide on May 12, 2010, informing them of the magnitude of damages suffered by Plaintiffs' customers and inviting both entities to participate in communicating with customers regarding resolution of those claims.   O'Neal and Leeco received no response other than a denial of liability.  O'Neal and Leeco then proceeded to finalize the resolution of the claims of their customers.

The total amount of O'Neal's and Leeco's resolution of customers' claims to date does not reflect the total amount of O'Neal's and Leeco's exposure and potential damages, as O'Neal and Leeco may be exposed to liability by virtue of other non-conforming steel that may be incorporated into end products of other customers to an extent not yet known.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs O'Neal Steel, Inc., and Leeco Steel, LLC, seek an order and/or entry of judgment from the trial court or a determination by a jury requiring Defendants Worldwide Steel Unlimited, Inc., General Purpose Steel, Inc., Lance Chatkin and Bruce Adelstein to indemnify and hold harmless O'Neal and Leeco for sums paid to defend and settle claims brought by their customers as a result of the sale of the non-conforming steel fraudulently supplied by Defendants.

**PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY.**

/s/Crawford S. McGivaren, Jr.
Crawford S. McGivaren, Jr.
Herbert H. West, Jr.
Annette Lanning Kinderman

OF COUNSEL:
CABANISS, JOHNSTON,
GARDNER,
    DUMAS & O'NEAL LLP
2001 Park Place North, Suite 700
Birmingham, Alabama  35203
Telephone: (205) 716-5200
Facsimile: (205) 716-5389

Attorneys for plaintiffs O'Neal Steel,
Inc. and Leeco Steel, LLC

65

## **PLAINTIFFS REQUEST SERVICE BY EXPRESS MAIL AND BY UNITED STATES MARSHAL**

Serve Defendants by United States Marshal:

Worldwide Steel Unlimited, Inc., c/o President Lance Chatkin
1001 East Entry Drive
Suite 200
Pittsburgh, Pennsylvania 15216

General Purpose Steel, Inc., c/o President Lance Chatkin
505 Braddock Avenue
Turtle Creek, Pennsylvania 15145-2066

Lance Chatkin
300 Meadow Court
Monroeville, Pennsylvania 15146

Serve Defendants by Express Mail:

Bruce Adelstein
18 Laurel Hill Lane
Pepper Pike, Ohio 44124